United States Court of Appeals
Fifth Circuit

**F I L E D**

**May 19, 2003**

Charles R. Fulbruge III
Clerk

Revised May 28, 2003

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 01-11392

_____

LEASEHOLD EXPENSE RECOVERY, INC.,

Plaintiff-Appellant,

v.

MOTHERS WORK, INC.; MOTHERS Work (RE) INC.,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Texas

_____

Before BENAVIDES and DENNIS, Circuit Judges, and WALTER[*],
District Judge.

BENAVIDES, Circuit Judge:

This appeal concerns the interpretation of a contingency fee contract under Texas law.  The appellant claims that the district court erred in entering judgment for the appellees on its breach of contract claims, conspiracy claim, and claim for recovery in quantum meruit.

_____

[*]District Judge of the Western District of Louisiana, sitting by designation.

-1-

I.  Background

Appellant Leasehold Expense Recovery, Inc. ("LER") is in the business of reviewing retail leases for overcharges.  Appellees Mothers Work, Inc. and Mothers Work (R.E.) Inc. (collectively "Mothers") sell maternity clothing from retail stores operating from shopping malls throughout the country.  On March 15, 1994, LER entered into a Contingent Fee Contract (the "Contract") with A Pea in the Pod ("APIP"), which thereafter merged with Mothers, who assumed APIP's rights and responsibilities under the Contract.  Under the Contract drafted by LER, LER agreed to review sixty-three of APIP's leases with shopping malls to determine whether landlords were overcharging for rent and operating expenses.  The Contract authorized LER to negotiate and collect upon a settlement regarding overcharges with each landlord, within certain limitations, and described the terms of LER's compensation.  The Contract also included a provision regarding termination.

In 1994, LER reviewed twenty-one leases and found more than $500,000 in potential overcharges. Mothers eventually authorized LER to proceed with thirteen of the twenty-one audits.  From 1996 to 1997, LER contacted landlords and attempted to recoup alleged overcharges on behalf of Mothers.  However, all thirteen of the landlords refused to deal with LER without an authorization letter from Mothers.  LER maintains that although Mothers repeatedly promised that such authorizations would be

forthcoming, they were never provided.  LER believes that Mothers used the knowledge of past overcharges to negotiate new, more favorable leases with its landlords on its own.  Mothers refused to pay LER for its work, on the grounds that LER was not entitled to compensation under the terms of the Contract.

On January 10, 2000, LER sued Mothers in Texas state court for breach of contract, fraud, negligence, grossly negligent misrepresentation, and conspiracy.  Mothers removed the claim to federal court, which has diversity jurisdiction.  Mothers moved for summary judgment as to all of LER's causes of action.  The magistrate judge prepared a report and order on April 27, 2001, recommending that the motion be granted in part and denied in part.  The magistrate judge recommended that summary judgment be denied only with respect to LER's breach of contract claims concerning three stores.  On July 26, 2001, the district court adopted the magistrate judge's report and recommendations in full.  On August 20, 2001, the district court rejected LER's motion to reconsider the July 27, 2001 Order.  Following a short bench trial on LER's remaining claims, the district court awarded Mothers judgment as a matter of law, save a $9,074.46 award concerning an amount that was uncontested.

## II.  Standard of Review

This court reviews a district court's grant of summary judgment *de novo*. *Rivers v. Cent. and S. W. Corp.,* 186 F.3d 681,

-3-

682 (5th Cir. 1999).  Summary judgment is appropriate, when, viewing the evidence in the light most favorable to the nonmoving party, the record reflects that no genuine issue of any material fact exists. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-324, (1986); *Sulzer Carbomedics, Inc.*, 257 F.3d at 456.  *See also Transitional Learning Cmty. at Galveston, Inc. v. U.S. Office of Pers. Mgmt.,* 220 F.3d 427, 429 (5th Cir. 2000).  A material fact is one that "might affect the outcome of the suit under the governing law" and a "dispute about a material fact is 'genuine'...if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Sulzer Carbomedics, Inc.,* 257 F.3d at 456 (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

Challenges to the district court's determinations of fact following a bench trial are reviewed for clear error, and conclusions of law are reviewed *de novo.  Kona Tech. Corp. v. S. Pac. Transp. Co.,* 225 F.3d 595, 601 (5th Cir. 2000).  Since this case comes to the court through diversity jurisdiction, the substantive law of Texas applies.  *Id.; See Erie R.R. v. Tompkins,* 304 U.S. 64, 78-79 (1938).

### III.  Breach of Contract Claims

"Under Texas law, the interpretation of an unambiguous contract, as well as the determination of whether or not a

-4-

contract is ambiguous, is a legal question." *Steuber Co. v. Hercules Inc.,* 646 F.2d 1093, 1098 (5th Cir. 1981). If the contract terms are susceptible to only one reasonable construction, the contract is unambiguous and will be enforced as written. *Guaranty Nat. Ins. Co. v. Azrock Industries Inc.,* 211 F.3d 239, 243 (5th Cir. 2000).

In contract disputes, the court's primary concern is to give effect to the written expression of the parties' intent. *Nat'l Union Fire Ins. Co. v. Care Flight Air Ambulance Service, Inc.,* 18 F.3d 323, 328-39 (5th Cir. 1994). In doing so, the court reads all parts of the contract together to ascertain the agreement of the parties, ensuring that each provision of the contract is given effect. *Id.* at 329; *Kona Tech. Corp.,* 225 F.3d at 610; *Sulzer Carbomedics, Inc.,* 257 F.3d 449 (5th Cir. 2001).

A.   Under the Contract, is LER entitled to compensation for overcharges discovered, but not recovered?

1.   Substantive Claim

LER contends that, by the plain terms of the Contract, the district court erred in granting summary judgment to Mothers regarding eighteen stores, and judgment as a matter of law following a bench trial regarding three stores, with respect to overpaid charges that it discovered regarding all of the twenty-one stores. LER contends that the plain terms of the Contract entitle it to compensation for discovered overcharges, regardless

-5-

of whether Mothers actually recovered any of the overpayments. Mothers responds that the district court properly held that the Contract unambiguously assigns LER a 50% interest only in those overpaid charges that are actually recovered.  Two sections of the Contract are particularly relevant to this dispute:

> **Article 1, Section 1.2, FEES.**  In consideration of the services rendered and to be rendered to the Client by LER, the Client does hereby assign, transfer and convey to LER as compensation herein, a fifty percent (50%) undivided interest in all overpaid Charges relating to each and every lease, including any other amounts recovered relating thereto, that:
>
>> (a)  are actually recovered in cash, check or the like by Client;
>> (b)  are recovered in the form of a credit to Client's account with any landlord pursuant to any lease; and,
>> (c)  are otherwise recovered by Client.
>
> All compensation herein as stated in Sections 1.2(a) through 1.2(c) shall herein together constitute "LER Fees."  LER Fees shall be paid to LER by Client within ten (10) days of Client's receipt of overpaid Charges on any lease, or the credit thereof.
> ...
> **Article 2, Section 2.1, TERMINATION.**  LER or Client may terminate this Agreement upon fifteen (15) days prior written notice by delivering said notice to Client.  Said termination shall not affect the right of LER to collect LER Fees for any overpaid Charges either discovered or recovered as of the date of termination of this Agreement.  Under all circumstances LER's right to collect LER Fees shall survive the expiration or termination of this Agreement.

The terms of the Contract unambiguously entitle LER to compensation only for those overpayments discovered by LER that

Mothers actually recovers.  While Article 1, Section 1.2 (hereinafter "Compensation Provision") states that LER is entitled to a fifty percent interest in *all* overpaid Charges, that right is subject to the satisfaction of subsections (a), (b), or (c), each of which require the Charges to be "recovered." We find without merit LER's contention that the three subsections were intended to relate solely to the phrase "including any other amounts recovered relating thereto," particularly given the placement of a comma (inserted by LER itself, as the drafter), following the word "thereto."  The presence of the comma indicates that both the phrase "including any other amounts recovered relating thereto" *and* the earlier phrase "all overpaid Charges relating to each and every lease" are subject to the condition of recovery noted in subsections (a), (b) and (c).

Nor does Article II, Section 2.1 (hereinafter "Termination Provision"), support LER's argument that it is entitled to compensation for charges that Mothers has not recovered.  The Termination Provision was clearly intended to preserve LER's right to compensation *as described in the Compensation Provision,* as reflected by its use of the term "LER Fees."  The Compensation Provision unambiguously requires that Mothers actually recover on the discovered overpayments.  By implication, the parties intended the Termination Provision to protect LER's right to compensation upon termination to the same degree.  The phrase

"discovered or recovered" in the Termination Provision was merely intended to protect LER's entitlement to compensation for overpaid charges that it *discovered before* termination, but were not *recovered* until *after* termination.  LER's proposed interpretation of the Termination Provision, which would entitle it to compensation upon termination for overcharges merely discovered *or* recovered, is not only contrary to the plain meaning of the Contract, but would create a perverse incentive for LER to prematurely terminate the contract in order to avoid the recovery requirement under the Compensation Provision.  The district court properly granted Mothers judgment on this issue.[1]

2.   Procedural Claim

LER contends that the district court's decision to enter summary judgment on its breach of contract claims regarding eighteen stores was based on improperly considered evidence.  The magistrate judge struck the appendix that Mothers attached to its reply brief to LER's response to Mothers's motion for summary judgment as an impermissible attempt to introduce new evidence at the reply stage.  The magistrate judge also struck the Declaration of Eric Stahl for failure to include a date, as required by 28 U.S.C. § 1746. LER argues that the district court

---

[1]Our resolution of this issue renders LER's contention that the district court erred in refusing to entertain its assertion that the Contract was terminated by operation of a letter dated August 9, 2001, moot.

improperly relied upon this excluded evidence in granting summary judgment for Mothers.

LER's assertion is groundless. Following the district court's grant of summary judgment, LER, by motion, asked the district court to reconsider its judgment on the grounds that the district court had improperly taken into account the excluded evidence. Judge Solis, in denying the motion, stated that his decision did not implicitly or explicitly rely upon the excluded appendix or affidavit, and reemphasized that with or without the excluded evidence, LER failed to demonstrate genuine issues of material fact that any savings on the stores in question met the criteria for recovery set out in the Contract. Given this unequivocal denial and the ample support in the record for his conclusion in the absence of the excluded evidence, we see no reason to further question Judge Solis's ability to properly consider evidence.

B.   Under the Contract, Is LER entitled to compensation for future savings?

LER argued at trial that it was entitled under the Contract to be compensated for prospective overcharges that its efforts enabled Mothers to avoid in relation to three of its stores. LER's argument is premised upon a portion of the Compensation Provision, specifically Article 1, Section 1.2(c), which entitles LER to a fifty percent interest in "all overpaid Charges relating

to each and every lease, including any other amounts recovered relating thereto, that:...(c) are otherwise recovered by Client." LER contends that this language can reasonably be interpreted as entitling LER to compensation for future overcharges that its efforts prevented. LER contends that the district court's determination that the Contract unambiguously did not provide for compensation for such savings was erroneous, and parol evidence should not have been permitted to clear up the ambiguity in the Contract.

Mothers argued, and the district court agreed, that the Compensation Provision entitles LER to recover only when two things occur: (1) Mothers actually overpaid a charge to the landlord; and (2) the overpaid charge was recovered. We agree that this the only reasonable interpretation of the Contract.

"[A] contract is ambiguous only when the application of the applicable rules of interpretation to the instrument leave it genuinely uncertain which one of the two meanings is the proper meaning...". *R & P Enterprises v. LaGuarta, Gavrel & Kirk, Inc.,* 596 S.W.2d 517, 519 (Tex. 1980). While LER concedes that the phrase "overpaid Charges" does not encompass future savings on rent or other charges, it contends that future savings are nonetheless recoverable as "other amounts relating thereto." Such an interpretation, however, ignores the requirement of subsections (a),(b), and (c), all of which require "other

-10-

amounts" to be *recovered.* A landlord's decision to charge Mothers the proper amount of rent in the future does not constitute a "recovery" for prior overcharges paid. If a landlord were to give Mothers a discount on the proper amount of rent, or provide free utilities for a year as repayment for the prior overcharges, this would constitute a recovery, and LER would be entitled to 50% of the value of the discount.

The Contract simply does not contemplate the situation where Mothers may be unable to recover past overpayments, but benefits from LER's work nonetheless in the sense that it does not overpay in the future. "The failure to include more express language of the parties' intent does not create an ambiguity when only one reasonable interpretation exists. *Columbia Gas Transmission Corp. V. New Ulm Gas, Ltd.,* 940 S.W.2d 587, 591 (Tex. 1996). Nor is parol evidence of the parties' intent permitted to create an ambiguity. *Constitution State Ins. Co. v. Iso-Tex Inc.* 61 F.3d 405, 408 (5th Cir. 1995). Read as a whole, the Compensation Provision clearly entitles LER to compensation only for charges that Mothers overpaid and actually recovered. This is the only reasonable interpretation of the Contract, as the district court correctly found.

C.   Did Mothers breach the Contract by settling overcharges with the landlords without the knowledge of LER?

LER contends that with respect to eight[2] store locations where overcharges were discovered, Mothers engaged in secret "side deals" with each landlord by executing lease amendments by which it recovered the overcharges in the form of credits and lower future rents.  LER alleges that Mothers engaged in these *quid pro quo* settlements in explicit violation of Article I, Section 1.1 which bars settlements in the absence of LER's consent, in an attempt to avoid compensating LER under the Contract.

Mothers does not dispute that *if* it had entered into the settlements alleged by LER, it would indeed have breached the Contract.  However, it contends, and we agree, that in order to prove that a lease amendment was executed as a form of *quid pro quo* transaction, LER needs to demonstrate two things:  (1) that the new lease terms were more favorable to Mothers than the previous terms; and (2) that the new, more favorable terms were obtained in exchange for the release of an Overcharge Claim.  In other words, LER, to prevail on any one of its eight *quid pro quo* claims, needs demonstrate that Mothers successfully used knowledge of overcharges, obtained as a result of LER's efforts,

---

[2]One of the stores cited by LER, as Mothers points out, was not subject to the Contract.  The Albany (Crossgates) store was not included in the addendum to the Contract, which listed the stores whose leases LER was granted authority to review.  There was therefore no possible breach of contract regarding any lease alterations to this store location.

as leverage to negotiate improved lease terms with a landlord.

LER's evidence on appeal suffers from the same defect as that noted by the magistrate judge:

> With respect to most of these leases, LER has done nothing more than include the amendments in its appendix. There is no evidence that the terms of the amendments are more favorable to Mothers Work than those of the prior leases. The court is neither required nor inclined to come [sic] through LER's 687 page appendix in search of evidence to support these claims.

Though equally disinclined to comb through the disorganized and ill explained documents provided by LER, a thorough review of the record reveals that the evidence submitted regarding the stores located in Beverly Hills, California, Pasadena, California, Palo Alto, California, Dallas, Texas, Buffalo, New York, and Syracuse, New York, do not create an issue of material fact regarding whether the amended terms are more favorable to Mothers than those that preceded them. We are simply not provided with any standard of comparison that would allow us to determine that the above mentioned leases were either modified or terminated to Mothers's benefit.

Moreover, we are unable to link any benefits that Mothers may have gained through modifications or terminations to any of the leases to a promise on the part of Mothers to relinquish an Overcharge Claim discovered by LER. LER's bald assertion that Mothers must have used overcharge information gleaned from LER's

reviews as leverage to obtain better lease terms is insufficient to withstand judgment as a matter of law. The district court therefore correctly granted Mothers summary judgment on LER's *quid pro quo* claims.

D.   Did Mothers have an implied duty to cooperate under the Contract?

Next, LER contends that the district court erred in granting summary judgment on its claim that Mothers violated an implied duty in the Contract to cooperate. Specifically, LER asserts that after it made initial contact with thirteen landlords, pursuant to Mothers's approval, these landlords refused to negotiate with LER in the absence of a letter on Mothers letterhead confirming that LER was authorized to act on Mothers's behalf. LER made several requests, both oral and written, to at least three different Mothers employees for such letters. LER contends that Mothers employees repeatedly informed LER that they wished LER to continue its work pursuant to the Contract and that the necessary authorization letters would be forthcoming. Because it never received the letters, LER alleges that it was unable to recover discovered overcharges with respect to those thirteen stores and was thus denied compensation under the Contract.

The court predicated its grant of summary judgment on this claim upon the language of the Contract, which it interpreted as

unambiguously giving Mothers the authority to withhold its

cooperation.   The court referred to Article 1, Section 1.1, which

proceeds as follows:

> **1.1 Services.**  Concerning all sixty-three (63) leases,
> Client hereby employs LER to review the leases and the
> terms thereof and certain books and records relating to
> the Charges, and collect overpaid Charges from the
> landlords, if any.  *LER is fully authorized to
> negotiate a settlement thereof; but it is distinctly
> understood that no settlement shall be made by LER
> without the approval of Client*, and Client hereby
> agrees to make no settlement or offer of settlement
> without the consent of LER.  LER may determine the
> order of review of the sixty-three (63) leases.  *Prior
> to LER contacting any landlord, Client shall approve
> all potential contact and action by LER, it being
> understood that LER shall have no right to sue the
> landlord or otherwise harass the landlord, without
> Client's express written instructions.* (emphasis
> added).

 Relying on *Bank One, Texas, N.A. v. Stewart,* 967 S.W.2d 419,

434 (Tex. Ct. App. 1998), the district court adopted the

magistrate judge's finding that "under Texas law, implied

covenants are disfavored and grafted onto contracts, 'only if

necessary to effectuate the intention of the parties as disclosed

by the contract as a whole, but not to make the contract fair,

wise or just...[and] [t]here can be no implied covenant as to a

matter specifically covered by the written terms of the

contract.'"  We disagree, however, with the district court's

application of this rule of law.  It appears to us that the above

portion of the Contract does not address the question of

cooperation as clearly as the court presumed.  Section 1.1 states

-15-

that "LER is fully authorized to negotiate a settlement [regarding overpaid Charges]." The section requires LER to receive the approval of Mothers prior to (1) posing an offer of settlement to a landlord; (2) contacting a landlord; or (3) suing or harassing a landlord. Mothers's failure to provide authorization letters, an assertion that it does not dispute, does not constitute a valid exercise of its right to approve or disapprove contact between LER and a landlord. Nor can Mothers legitimately claim that it withheld the authorization letters because of a fear that simply confirming LER's authority to negotiate would disrupt its relationships with its landlords. Otherwise, it would not have contractually granted LER the authority to negotiate on its behalf in the first place. In failing to supply the needed authorization, Mothers did not merely determine that a good relationship with a particular landlord superceded recovering overcharges by vetoing a particular contact. Instead, it ended negotiations altogether with thirteen landlords, and thus made it impossible for LER to perform under the Contract. A duty on the part of Mothers to cooperate by providing LER with authorization letters was so clearly in the contemplation of the parties that they deemed it unnecessary to immortalize it in the contract. A duty to cooperate must necessarily be implied to enable LER to negotiate pursuant to the limited powers granted to it in the Contract.

There is ample support in the case law for implying a duty to cooperate in the circumstances of this case.  This court held in *Citizens Nat'l Bank of Orlando v. Vitt,* that:

> 'in every contract between a contractor and a subcontractor, an implied promise exists on the part of the contractor that he will do nothing to prevent, interfere or hinder the subcontractor in his performance or increase the cost thereof'...[w]henever the cooperation of a promisee is necessary for the performance of a contract, there is an implied condition of the contract that the cooperation will be given.

367 F.2d 541, 544-45 (5th Cir. 1966)(citations omitted).  The relationship between LER and Mothers can be analogized to that of a contractor and a subcontractor, or that of any other principal and agent.  Similarly, in *Levine v. Bayne, Snell & Krause, Ltd.,* Justice Owens, in her concurrence, noted that a client may be subject to an implied covenant to cooperate with the attorney whom he hired on a contingency basis.  40 S.W.3d 92, 99 (Tex. 2000).  Perhaps most analogously, in an unpublished opinion a Texas Court of Appeals affirmed a trial court's judgment against a homeowner for violating an implied duty to cooperate in a contract conveying the plaintiff an option to purchase the defendant's home.  *Elliott v. Lewis,* 1994 WL 709333 (Tex. Ct. App. 1994).  The defendant homeowner had refused to sell her home to the plaintiff after the expiration of the option.  The plaintiffs had been unable to arrange financing before the option expired, and the court held that the defendant had a duty to

cooperate with their attempts to obtain financing within the option period. *Id.* The trial court had instructed the jury that "whenever cooperation is necessary for performance of a contract, there is an implied condition of contract that cooperation will be given." *Id.* at *9.[3]

We therefore find that the district court erred in granting summary judgment to Mothers as a matter of law on LER's breach of an implied duty to cooperate claim. Neither the rule of law in this jurisdiction or the terms of the Contract bar the court from finding an implied duty to cooperate, and LER has presented sufficient evidence to raise a genuine issue of fact as to whether this duty was breached. The grant of summary judgment is therefore vacated, and we remand the claim to the district court for trial.

E.    Can LER recover in quantum meruit?

LER claims that the district court erred in dismissing its request for relief in quantum meruit. Quantum meruit is an equitable theory which permits a "right to recover...based upon a promise implied by law to pay for beneficial services rendered

---

[3]*But c.f. Bank One,* 967 S.W.2d at 434 (refusing to imply that a bank has a duty to cooperate with its client when the parties specifically contracted the extent of their bailment relationship; *Chapman Children's Trust v. Porter & Hedges, L.L.P.,* 32 S.W.3d 429 (Tex. Ct. App. 2000) (declining to imply a duty to cooperate on the grounds that the parties purposefully determined during the course of negotiations not to subject the defendant to an express contractual duty to cooperate).

and knowingly accepted." *Black Lake Pipeline v. Union Const. Co., Inc.,* 538 S.W.2d 80, 86 (Tex. 1976). "As a general rule, a plaintiff who seeks to recover the reasonable value of services rendered or materials supplied will be permitted to recover in quantum meruit only when there is no express contract covering those services or materials." *Black Lake Pipeline,* 538 S.W.2d at 86. *See Jhaver v. Zapata Off-Shore Co.,* 903 F.3d 381, 385 (5th Cir. 1990).

A review of the Contract reveals that the terms of LER's compensation was indeed dealt with under the Compensation Provision of the Contract. The mere fact that the Contract does not particularly address LER's out-of-pocket expenses does not imply that such expenses fall beyond the scope of the Contract, as LER contends, because the services for which the out-of-pocket expenses were incurred *were* covered by the Contract. Had the parties contemplated that LER would be reimbursed for its out-of-pocket expenses, such compensation would have been included in the Compensation Provision. Instead, the parties intentionally structured the Contract as a contingency fee arrangement, whereby LER would risk its out-of-pocket expenses for the promise of a fifty percent interest in any recovered overcharge.

There is, however, a clear exception to the general rule which LER may take advantage of if it successfully demonstrates at trial that Mothers breached an implied duty to cooperate. In

1988, the Texas Supreme Court held that "recovery in *quantum meruit* is allowed when a plaintiff has partially performed an express contract but, because of the *defendant's* breach, the plaintiff is prevented from completing the contract." *Truly v. Austin,* 744 S.W.2d 934, 936 (Tex. 1988)(emphasis in original). *See McFarland v. Sanders,* 932 S.W.2d 640, 646 (Tex. Ct. App. 1996). If Mothers violated the duty to cooperate implied in the Contract, then LER was unable to recover any potential overcharges on Mothers's behalf because Mothers breached the contract. We must therefore also vacate the district court's grant of summary judgment for Mothers on LER's claim that it is entitled to recover in quantum meruit insofar as it relates to LER's implied duty to cooperate claim.[4]

_____

[4]LER did not challenge on appeal the district court's determination that the benefit-of-the-bargain damages that it claimed were the result of Mothers's non-cooperation were too speculative to be given credence. Failure to raise an issue on appeal constitutes a waiver of that argument, and thus LER may not recover expectation damages if it prevails on its duty to cooperate claim. *See United States v. Thibodeaux*, 211 F.3d 910, 912 (5th Cir. 2000); *Yohey v. Collins*, 985 F.2d 222, 224-25 (5th Cir.1993). However, LER did dispute the district court's conclusion that it had failed to include damages in the form of out-of-pocket expenses in its pleadings or in its response to Mothers's motion for summary judgment. Because LER did indeed assert out-of-pocket damages in its "Appendix to Plaintiff's Response to Defendants' Motion For Summary Judgment," this finding of the district court was clearly erroneous. LER may thus seek to recover the value of its time and the out-of-pocket expenses it incurred in investigating the billing practices of the thirteen stores for whom an authorization letter was requested but never received. *See McFarland v. Sanders,* 932 S.W.2d 640, 645-46 (Tex. Ct. App. 1996).

IV.  Conspiracy Claim

LER asserts that the district court erred in granting summary judgment to Mothers on LER's claim that Mothers conspired with its counsel, Graham Miles, to enter secret "side deals" with its landlords in an attempt to avoid compensating LER under the Contract.  The district court concluded that LER had waived this argument by failing to present evidence of a "Miles conspiracy" to the magistrate judge, and in the alternative, had failed to create a genuine issue of material fact as to the existence of a conspiracy.

We agree with the district court that LER's allegations regarding a "Miles conspiracy" were legally insufficient.  First, a conspiracy to breach a contract is not actionable under Texas law.  *Grizzle v. Texas Comm. Bank,* 38 S.W.3d 265, 285 (Tex. Ct. App. 2001), *pet. granted on other grounds,* 45 Tex. S. Ct. J. 358 (Feb. 9, 2002).  LER, however, has not alleged that Miles conspired with Mothers to commit any tort, nor did it appeal the district court's dismissal of its tort claims as a matter of law. *See Carmon v. Lubrizol Corp.,* 17 F.3d 791, 794 (5th Cir. 1994)("[I]ssues not raised at all [on appeal] are waived.").

Second, it is established that a corporation cannot conspire with itself, no matter how many of its agents participated in the wrongful action.  13 Tex. Jr. 3d Civil Conspiracy § 3.  Graham Miles, as Mothers's lawyer, is an agent.  *See* Restatement (2d) of

Agency §§ 1,2. LER has not alleged that Miles has any independent interest that would make it possible for him, under Texas law, to conspire with Mothers. The district court therefore properly granted Mothers summary judgment on this claim.

### V. Rule 60 Claim

LER alleges that Mothers improperly withheld documents at the summary judgment stage, thereby denying LER of procedural and substantive due process and requiring that summary judgment be vacated. In support of its contention, LER points to Mothers's belated production of documents at trial, and alleges that by implication, Mothers probably withheld documents at the summary judgment stage as well.

LER's claim is properly styled as one to set aside the district court's grants of summary judgment pursuant to Fed. R. Civ. P. 60(b)(3). Rule 60(b)(3) reads: "...On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment...for the following reasons...(3) fraud,...misrepresentation, or other misconduct of an adverse party;...." LER, however, does not deny that it failed to file a 60(b)(3) motion in the district court. Instead, it contends that its motion for sanctions regarding the production of documents at the trial stage can be construed also as a motion to set aside summary judgment.

The broadest reading of LER's motion for sanctions does not permit us to construe it as a motion to set aside summary judgment. LER's Rule 60(b)(3) motion is therefore not properly before this court. *City of Waco, Texas v. Bridges,* 710 F.2d 220, 227 (5ᵗʰ Cir. 1983) ("As a general rule, an appellate court will not consider a new issue raised for the first time on appeal for the purpose of reversing the lower court's judgment."). Exceptions are made typically only in exceptional circumstances. LER has not attempted to explain its failure to make this motion to the district court. The trial court is the forum charged with the duty of determining questions of fact, and fairness requires that the motion be sent back to the district court in order to permit Mothers to present evidence to rebut LER's assertions. *See Wilson v. Johns-Malville Sales Corp.,* 873 F.2d 869, 871 (1989).

## VI. Conclusion

We conclude that the district court improperly granted Mothers summary judgment regarding LER's claim that Mothers breached an implied duty to cooperate. The district court's dismissal of LER's claim for recovery in quantum meruit was also erroneous, insofar as it precludes LER from recovering its out-of-pocket expenses in the event that it is able to prove that Mothers breached an implied duty to cooperate at trial. Those judgments are therefore VACATED and the claims REMANDED to the

district court for further proceedings.  The district court's judgments regarding all other claims are AFFIRMED.